Paul A. Conant, 012667
**CONANT & ASSOCIATES PLC**
Northern Trust Bank Tower, Suite 925
2398 East Camelback Road
Phoenix, Arizona 85016
Telephone: 602.508.9010
Facsimile:  602.508.9015
Email: docket@conantlawfirm.com
        Attorneys for plaintiffs

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

KINGSLEY CAPITAL MANAGEMENT,
LLC, an Arizona limited liability company,
and BRUCE PAINE KINGSLEY MD IRA
ROLLOVER, a Qualified Individual
Retirement Account,

        plaintiffs,

vs.

THE MEMBERS OF THE BOARD OF
DIRECTORS OF THE PARK AVENUE
BANK OF NEW YORK AS OF 2008:
DONALD G. GLASCOFF JR., CHARLES J
ANTONUCCI SR., BRUNO DE VINCK,
FREDERICK KELLER, PATRICK R.
MURPHY, ANGELLA MIRIZZI-OLSON,
MENDEL ZILBERBERG,

        defendants.

Case No.  _____

**COMPLAINT**

**Arizona Securities Act Violations:
Control Person Liability Under A.R.S.
§44-1999(B) and Indirect Liability Under
A.R.S. § 44-1991 (A)**

**(Jury trial demanded.)**

## **Statement Concerning Related Cases Before This Court**

This case is related to *Kingsley Capital Management LLC and Bruce Paine Kingsley IRA Rollover v SDH Realty Inc and Wilbur A. Huff,* CV-10-01381-PHX-NVW (consolidated) (referred to hereafter as "Kingsley v SDH/Huff"), and to *Kingsley Capital Management LLC and Bruce Paine Kingsley IRA Rollover v Brian Nelson Sly, et al,* No. CV-10-02243-PHX-NVW (referred to hereafter as "Kingsley v Sly").

## **Plaintiffs' Allegations.**

Plaintiffs Bruce Paine Kingsley MD IRA Rollover ("KIRA") and Kingsley Capital Management, LLC ("KCM") hereby allege as follows against the defendants:

## **Statement of Jurisdiction**

1.     The Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(1) because the amounts in controversy exceed the sum or value of $75,000.00, exclusive of interest and costs, and there is a complete diversity of citizenship between plaintiffs and defendants, as alleged herein.

## **Venue**

2.     Venue is proper in this Division of this District pursuant to 28 USC Section 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the property that is the subject of the action is situated, in this District, as alleged herein.

**Parties**

3.      Plaintiff KIRA is a qualified rollover individual investment retirement account into which Bruce Paine Kingsley, M.D. ("Dr. Kingsley"), its trustee, has made qualified contributions over a period of years from income derived from his employment as a physician in the State of Arizona, where he resides and has resided at all material times. It invested $650,000 in the investment addressed herein.

4.      Plaintiff KCM is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.  KCM is a single use LLC created and managed by Dr. Kingsley for the purpose of purchasing the investment addressed herein.  KCM was funded with $1.1 million in cash obtained primarily from a mortgage placed on Dr. Kingsley's principle residence, which he previously owned nearly free and clear.

5.      Defendant Donald G. Glascoff Jr. ("Glascoff") is an individual residing outside of the State of Arizona and at all material times was the Chairman of the Board of Directors of the Park Avenue Bank of New York, New York ("PAB").

6.      Defendant Charles J. Antonucci Sr. ("Antonucci") is an individual residing outside of the State of Arizona and at all material times was the Chief Executive Officer and President of PAB, and a Member of the PAB Board of Directors.

7.      Defendant Bruno De Vinck ("De Vinck") is an individual residing outside of the State of Arizona and at all material times was a Member of the Board of Directors of PAB.

8.     Defendant Frederick Keller ("Keller") is an individual residing outside the State of Arizona and at all material times was a Member of the Board of Directors of PAB.

9.     Defendant Patrick R. Murphy ("Murphy") is an individual residing outside the State of Arizona and at all material times was a Member of the Board of Directors of PAB.

10.     Defendant Angella Mirizzi-Olson ("Mirizzi-Olson") is an individual residing outside the State of Arizona and at all material times was a Member of the Board of Directors of PAB.

11.     Defendant Mendel Zilberberg ("Zilberberg") is an individual residing outside the State of Arizona and at all material times was a Member of the Board of Directors of PAB.

12.     The seven (7) above-identified defendant members of the Board of Directors of PAB are referred to herein, collectively, from time to time, as the "Board Defendants".

13.     The defendants, and each of them individually, directly or indirectly controlled a person (Antonucci) liable for a violation of ARS Section 44-1991 to these plaintiffs in the State of Arizona, thus causing events to occur in this Division of this District and out of which the claims in this civil action arises, as more fully alleged herein.

### Statement of Claims

14.     Charles J. Antonucci Sr. was the President, Chief Executive Officer, and a member of the Board of Directors of PAB in 2008.

15.     In 2008, Antonucci and others induced these plaintiffs to invest money with a customer of PAB, causing plaintiffs to deposit $1.75 million into one of the PAB accounts

that the customer controlled, supposedly (according to the presentation at the March 2008 Investor Meeting, at which Antonucci also made a presentation) to be held for insurance reserves.

16.     Plaintiffs now know that, shortly after they invested, their funds were not held for insurance reserves but were, instead, used (along with other funds) as part of a so-called "round trip transaction" in which Antonucci personally participated, through which he sought to personally profit, for which he has been criminally charged with federal felonies and to which he has since pled guilty and is awaiting sentencing. Exhibit 1 hereto is a true and correct copy of the Complaint in *United States of America v Charles J. Antonucci Sr.* dated March 13, 2010 and is incorporated herein by this reference; Exhibit 2 hereto is a true and correct copy of the U.S. Attorney's office October 8, 2010 plea agreement news release, and is also incorporated herein by this reference.

17.     Antonucci was separately sued in state court in Arizona by these plaintiffs for, among other things, violations of the Arizona Securities Act ("ASA") in connection with his role in inducing these plaintiffs' investments. That case was removed to this court at CV-10-02243-PHX-NVW. The Amended Complaint therein (Doc. 1-3 and 1-4) was thereafter pursued to final judgment against Antonucci in favor of these plaintiffs on May 25, 2011. *Id* at Doc. 45.

18.     Collection efforts on that judgment, and on the judgment in favor of these plaintiffs in CV-10-01381-PHX-NVW, has been underway.

19.     In its December 2010 "In-Depth Review of the Failure of The Park Avenue Bank, New York, New York" ("Audit"), the Office of Inspector General ("OIG") of the Federal Deposit Insurance Corporation ("FDIC") made findings concerning the "Causes of Failure and Loss" including, among others, that "Park Avenue failed primarily because of lax oversight by its Board and management and a lack of sound corporate governance," (Audit, page 3). A true and correct copy of this Audit is attached hereto at Exhibit 3 and incorporated herein by this reference.

20.     These plaintiffs seek recovery in this action against those persons who were members of the board of directors of PAB in 2008 on grounds of ASA violations including, among other things, "control person" liability under A.R.S Section 44-1999(B) and pursuant to, *inter alia*, the rationales set forth in *Eastern Vanguard Forex, Ltd. v. Ariz. Corp. Comm.,* 206 Ariz. 399, 79 P. 3d 86 (Ariz. App. 2003) and or *Barnes v. Vozack*, 113, Ariz. 269, 550 P. 2d 1070 (1976).

21.     Plaintiffs' unrecovered damages on their $1.75 million investment are substantial; judgment collection efforts have resulted in the recovery of $4,627.50 to date.

22.     This suit is brought within less than two years of the date when these plaintiffs knew or should have known of the claims alleged herein.

23.     Antonucci, while under the "lax oversight" of the Board Defendants and in an environment characterized by a "lack of sound corporate governance", was materially involved in overcoming plaintiffs' hesitation and opposition to invest by making to these plaintiffs materially false or misleading statements, making material misrepresentations of

1  fact, and also making statements and omitting to state facts which, thus, made the total mix

2  of information he provided to these plaintiffs materially false, the falsity of which caused

3  these plaintiffs' securities investment losses which are the subject of this civil action in that

4  the funds these plaintiffs invested were not held for insurance reserve purposes but used

5  instead for the illegal "round-trip transaction", the Huff businesses were not doing "very

6  well" and were not making "a lot of money."

7      24.    In or about March of 2008, Antonucci travelled to Arizona on the private jet

8  of a PAB customer for the purpose of speaking, as President and CEO of PAB, to an

9  assembly of that bank customer's investors and potential investors, including Dr. Kingsley,

10  at the Phoenician Resort and Hotel, 6000 East Camelback Road, Scottsdale AZ 85251,

11  regarding an investment known as Preferred Units of Oxygen Investment Partners LLC,

12  a/k/a Accredited Investor Resources LLC (referred to hereafter as "AIR").

13      25.    The PAB customer was Wilbur A. Huff, a.k.a. W. Anthony Huff ("Huff").

14      26.    The meeting occurred on March 15, 2008 ("March 2008 Investor Meeting").

15      27.    Antonucci was present at this presentation the entire time that Dr. Kingsley

16  was present.

17      28.    On information and belief, PAB did not then have a policy which prohibited

18  its President and CEO from speaking directly to investors and potential investors in a bank

19  customer's business.

20

21

22

29.     At the outset of the March 2008 Investor Meeting, with Antonucci present, Brian Nelson Sly ("Sly") told the assembled persons that they would be updated in the meeting as to the then current status of the AIR investment created by Sly and Huff.

30.     Huff was also present throughout the meeting.

31.     Antonucci was present during Sly's presentation of the investment during which Sly represented that investor funds were held in FDIC insured accounts at PAB, and held there solely for the purpose of demonstrating a certain level of "insurance reserves" for Huff-controlled Professional Employer Organization ("PEO") and workers' compensation insurance related businesses.

32.     Huff made statements consistent with what Sly had stated about the nature of the investment.

33.     Huff and Sly are defendants in CV-10-02243-PHX-NVW relative to this and other matters alleged therein.

34.     Sly and Huff then jointly introduced Antonucci as "our banker" and "President and CEO" of PAB.

35.     Huff additionally represented that he frequently used PAB offices for meetings and other business activities in New York.

36.     During his own statements which followed, Antonucci did not disagree with Sly's presentation, and made no statements at variance with what Sly had said.

37.     Antonucci also did not disagree with what Huff had said, and made no statements at variance with what Huff had said.

38.     Rather, during his statements, Antonucci thanked Huff for his business relationship with PAB, verified that Huff and Huff-controlled entities were PAB's largest customer and warmly described both his close business relationship with Huff and PAB's extensive ongoing involvement with Huff's PEO and workers' compensation insurance businesses associated with the AIR investment.

39.     Antonucci's statements indicated that PAB was pleased to participate in the previously described-structure where the Huff-related businesses held investor money at PAB for the purpose of demonstrating a certain level of funds on hand for insurance reserve purposes.

40.     From these statements, Dr. Kingsley reasonably concluded that Antonucci and PAB had detailed knowledge of Huff's businesses' structure, agreements with their investors, their deposits, business plans, operations, creditworthiness and financial substance, all of which he thus believed Antonucci and PAB had concluded were sound and strong, and that Antonucci and PAB were prepared to receive additional investor funds to be held in PAB for insurance reserve purposes.

41.     At the March 2008 Investor Meeting, Dr. Kingsley asked Antonucci if he was himself an investor or planned to be.

42.     Antonucci represented in response that, while he could not invest due to PAB policies, "these guys are doing very well" thus vouching to Dr. Kingsley for both the strength of the Huff-controlled businesses and approving of and acknowledging the "insurance reserves" structure of the investment explained earlier by Sly in that meeting,

1   and making it seem that, but for the PAB policies he referenced, he would be an eager

2   investor because the Huff-related businesses were "doing very well".

3          43.    In fact, "these guys" (the Huff related companies) were not "doing very well",

4   as Antonucci then knew, as alleged herein more fully below, knew his statement that they

5   were was false, and omitted material, truthful information then known to him about the

6   Huff-related businesses which, if not omitted, would have indicated the falsity of his

7   statement. (Allegations about significant Huff-related company overdrafts at PAB appear

8   below.)

9          44.    For, as plaintiffs now know, as of March 2008 Investor Meeting, an audit of

10  PAB by the FDIC was then underway; this audit would lead to the discovery of significant

11  Huff-related company overdrafts at PAB.

12         45.    On information and belief, Antonucci knew that the FDIC audit would

13  ultimately conclude that PAB's capital situation was worsening as compared to the prior

14  audit, that he was overextending credit to Huff-related businesses, and the audit would thus

15  place PAB at risk for being required to obtain permission from regulators to engage in

16  certain banking transactions, thereby diminishing its value.

17         46.    Antonucci was then a part-owner of PAB and thus had a financial incentive to

18  make materially untruthful and misleading statements, and omit truthful material facts, from

19  his presentation at the March 2008 Investor Meeting generally and to Dr. Kingsley

20  specifically because the investment money that the Huff-related companies were seeking

21

22

1    was planned for deposit at PAB which would have thus increased its value and improved its

2    future regulatory audit results.

3        47.    Antonucci was thereafter personally involved in arranging for PAB to provide

4    letters of credit to these plaintiffs as security for their investments and met with Dr.

5    Kingsley again before he invested, as alleged herein below.

6        48.    The official records of PAB also reflect that the institution had actual and

7    constructive knowledge of these plaintiffs' investments.

8        49.    As one inducement to plaintiffs to invest, Huff requested, and Antonucci

9    caused PAB to provide, plaintiffs with Irrevocable Standby Letters of Credit that purported

10   to guarantee the security of these plaintiffs' investments.

11       50.    These letters of credit were signed by Antonucci and Matthew Morris, a vice-

12   president of PAB ("Morris") who assisted Antonucci from time to time.

13       51.    As part of the pre-investment process of providing these letters of credit to

14   plaintiffs, Dr. Kingsley travelled from Arizona to meet with Antonucci at the PAB offices in

15   New York City on June 18 and June 19, 2008.

16       52.    Antonucci gave Dr. Kingsley a tour of the PAB offices and introduced him to

17   persons represented by Antonucci to Dr. Kingsley to be key PAB employees, including

18   Morris.

19       53.    While an invitee in Antonucci's personal offices at PAB during that June 2008

20   trip, Antonucci represented to Kingsley during that trip that PAB was very excited about the

21   growth of Huff's businesses, stating that "These guys are making an awful lot of money".

22                                              -11-

Morris was present when Antonucci said that to Dr. Kingsley. Morris, in a private conversation with Dr. Kingsley that same day said, "Huff has a money machine". Morris sounded envious of the opportunity Dr. Kingsley had to invest in Huff's operations.

54.     Like Antonucci's statements at the March 2008 Investor Meeting, the foregoing statements by Antonucci and Morris and omissions of truthful fact were also material to Dr. Kingsley, were materially false or misleading at the time they were made or omitted, Antonucci knew them to be materially false or misleading when made or omitted, were made or omitted with the intent that Dr. Kingsley would rely upon them, and Antonucci reasonably anticipated that Dr. Kingsley would rely upon them as a substantial part of his investment decision, and Dr. Kingsley did rely on them to plaintiffs' detriment and damage.

55.     Alternately, Antonucci did not act with scienter, and instead made untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

56.     As with the March 2008 Investor Meeting, the opposite of what Antonucci said was true, as alleged herein, and Antonucci entirely omitted to disclose to Dr. Kingsley any of the true facts that would have exposed the statements he made as false and or misleading.

57.     On or about April 9, 2008, these plaintiffs now know, PAB increased a line of credit which had been initially extended to Oxygen Unlimited, a Huff-related company, in December 2007, for "working capital."

58.     The credit proceeds from the Oxygen Unlimited line of credit were deposited into a PAB account maintained by Oxygen Unlimited II.

59.     But, Huff companies simultaneously owed millions of dollars to PAB during that time frame in overdrafts which had been personally approved by Antonucci.

60.     Exhibit 1 hereto alleges that Antonucci was approving significant overdrafts, in part impliedly in exchange for private plane rides on Huff's jet, as early as "the Super Bowl in Phoenix, Arizona" in 2008, which occurred on February 3, 2008, over one month before the March 2008 Investor Meeting, and said allegations are true.

61.     Specifically, at the same time as he was making trips on Huff's private plane to "Phoenix, Arizona" in "early 2008" and "Augusta, Georgia" in "April 2008", the Huff-related entities "owed millions of dollars in overdrafts to" PAB. See Exhibit 1, paragraphs 32(a), 32(b) and 34.

62.     Antonucci thus knew, as alleged herein above, as of the March 2008 Investor Meeting (and, in fact, during all his pre-investment interactions with Dr. Kingsley), that Huff related companies had significantly over drafted their accounts at PAB, that "these guys" were not "doing very well" and that they were not "making a lot of money."

63.     As of Antonucci's June 2008 meeting with Dr. Kingsley, PAB, through its April 9, 2008 expansion of the PAB letter of credit to Oxygen, and approval of Huff-related

business entity overdrafts, was supporting what was a financially weak organization, contrary to what Antonucci had been telling Dr. Kingsley.

64.     After the June 2008 meeting with Dr. Kingsley, Antonucci represented that he had full authority to act on behalf of PAB to provide letters of credit to secure these plaintiffs' investments and, as verification of same, Antonucci instructed Morris to provide Dr. Kingsley with a portion of a document entitled "The Park Avenue Bank Credit Policy - 2007".  A true and correct copy of what was provided to Dr. Kingsley on July 15, 2008 is attached hereto as Exhibit 4.

65.     On information and belief, no PAB policy required Morris to report to the board of PAB, or anyone else at PAB, any inquiry with respect to Antonucci's authority other than Antonucci.

66.     Morris also stated, with Antonucci's authority, on information and belief: "The letters of credit we are issuing concerning Dr. Kingsley are fully cash backed by accounts held in my bank for Mr. Huff." A true and correct copy of said communication, dated July 15, 2008, is attached hereto as Exhibit 5.

67.     On information and belief, no PAB policy required Morris to obtain permission for making such representations from the board of PAB or anyone else at PAB other than Antonucci.

68.     Dr. Kingsley believed, at all times, that these statements of, and the conduct of, Antonucci, and Morris as directed by Antonucci, were fully authorized by PAB and its board of directors.

69.     Antonucci's statements, conduct and omissions in that regard, as well as the material conduct and omissions of others, and alleged herein above, thus materially induced Dr. Kingsley (along with the conduct of others) to invest through these plaintiffs.

70.     In addition to Antonucci's travels to Arizona, his assistant Morris communicated on multiple occasions with Dr. Kingsley's counsel, Rand Haddock, regarding the letters of credit transactions, requested Haddock to draft the letters of credit described herein, which were subsequently sent by PAB to Dr. Kingsley in Phoenix, where he received them before giving instructions to release the investment funds, which instructions originated from Phoenix.

71.     After Dr. Kingsley caused these plaintiffs to invest in or about July 17 and 18, 2008, those investment monies of $1.75 million were placed into the PAB account of Oxygen Unlimited II, LLC, numbered 5400040291.

72.     Those investment monies were held, undisturbed, in that account for a little over two (2) months.

73.     Those investment monies where then used (with other funds in that account) as part of the so-called "round trip transaction."

74.     On information and belief, in consideration for Antonucci's assistance to Huff in obtaining investment monies from these plaintiffs which were deposited into the account of a Huff-related entity at PAB, Huff in turn assisted Antonucci in attempting to make it appear as though PAB was better capitalized (by him), during a time when Antonucci knew that PAB's capital situation was worsening, through the so-called "round trip transaction."

75.     Exhibit 6 hereto is a true and correct copy of the July through October 2008 statements for the Oxygen Unlimited II, LLC account produced by Valley National Bank (the successor to PAB's deposits) in the *Kingsley v. Huff/SDH* case, showing plaintiffs investment monies of $1.75 million entering the account at PAB on the 17th and 18th of July, 2008, at page 1 thereof.

76.     Exhibit 6 hereto (page 6) includes a true and correct copy of Miscellaneous Debit memo dated October 6, 2008 showing the transfer of $2.6 million from the exact same Oxygen Unlimited II, LLC account referenced above to the PAB account of USIG (PAB account number 5200021179); this transfer was authorized by Morris. No significant transactions occurred in the interval between July 17, 2008 and October 6, 2008 in this account.

77.     In Count Four of the Information (Exhibit 1 hereto), Antonucci is charged with "Bank Fraud related to USIG Loans"; paragraph 44 identifies the above-described October 6, 2008 transfer as something very different from an insurance reserve, and in fact identifies it instead as follows: "From my analysis of Bank records, I and others have determined that the $2.6 million that CHARLES J. ANTONUCCI, SR.,      the defendant, purportedly invested in  the Bank in October 2008 was in fact money that Oxygen-related entities transferred to ANTONUCCI from their accounts at the Bank, and then replaced with Bank funds, through a loan that ANTONUCCI had approved…"

78.     $1.75 million of that $2.6 million transfer was these plaintiffs' investment monies.

79.     These plaintiffs' investment monies were thus not being held or used for any insurance reserve purposes but, instead, directly used for illegal activity in which Antonucci personally participated (*i.e.,* the round trip transaction).

80.     Antonucci has pled guilty to Count Four of the Information, which involves the transfer out of the Oxygen Unlimited, II account all monies therein, which included these plaintiffs' invested funds.

81.     In addition to what is alleged herein, above, concerning inducement and primary liability, Antonucci also participated in the ASA violations. He has admitted as part of his plea that: "During my tenure [as President and CEO of PAB] I abused the position of trust that I enjoyed. Sometimes I did this to enrich myself…."

82.     The Board Defendants had overall responsibility and authority for formulating sound policies and objectives for PAB and for effectively supervising its affairs during the relevant period.

83.     The Board Defendants had the legal power, either individually or as part of a group, to directly or indirectly control Antonucci's actions and conduct as alleged herein, at all relevant times, up to the date when he no longer was employed by PAB.

84.     The Board Defendants did not act in good faith with respect to their control or lack of control of Antonucci during the relevant period.

85.     The Board Defendants did not take reasonable steps to maintain and enforce a reasonable and proper ongoing system of appropriate supervision and internal controls during the relevant period.

86.     The Board Defendants did not act with due care as to their control of Antonucci during the relevant period.

87.     The Board Defendants' inaction indirectly induced Antonucci's fraud on these plaintiffs during the relevant period.

88.     On March 31, 2009 Glascoff sent a signed "To Our Valued Customers" letter with KCM's monthly PAB statement.

89.     The letter describes in glowing tones the personal investment of Antonucci and supposed substantial improvement in the bank's financial status when exactly the opposite was true, according to the Audit (Exhibit 3 hereto, page 10 and pages 22-23).

90.     Plaintiffs demand a trial by jury as to all issues so triable.

### CLAIMS FOR RELIEF

### First Claim For Relief

### (Control Person Liability Pursuant To ARS Section 44-1999(B))

### (Against All Defendants)

91.     Antonucci is liable to these plaintiffs pursuant to ARS Sections: 44-1991(A) because, in connection with transactions within or from Arizona involving an offer to sell or buy securities he (1) employed a device, scheme or artifice to defraud, (2) made untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which there were made, not misleading,  and (3) engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit; 44-2001(A) because the purchaser (plaintiffs) may

bring an action to recover the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased or the contract made, or for damages if the purchaser no longer owns the securities; and 44-2003(A) because an action brought under 44-2001 may be brought against any person who made, participated in or induced the unlawful sale or purchase, and such persons shall be jointly and severally liable to the person who is entitled to maintain such action, all as alleged herein.

92.    The Board Defendants are persons who directly or indirectly controlled Antonucci, as alleged herein.

93.    The Board Defendants, and each of them, are thus liable to these plaintiffs, jointly and severally, for their misconduct in violation of ARS Section 44-1999(B) to the same extent as Antonucci is liable to these plaintiffs for his violations of and liability pursuant to ARS Section 44-1991(A)(1), (2) and (3), 44-2001(A) and 44-2003(A).

94.    Plaintiffs thus seek recovery of their damages in an amount to be proven at a trial in this matter from the defendants, and each of them.

**Second Claim For Relief**

**(Indirect Liability Under ARS Section 44-1991 (A)(1), (2) and (3) and *Barnes v.***

***Vozack*, 113, Ariz. 269, 550 P. 2d 1070 (1976))**

**(Against All Defendants)**

95.     Defendants are liable to these plaintiffs pursuant to ARS Section 44-1991(A) (1), (2) and (3) on the facts as alleged herein for indirect violations of said statute; Antonucci has already been determined to be directly liable and so this claim, insofar as it is alleged against Antonucci, is only as to his indirect liability.

96.     Plaintiffs thus seek recovery of their damages in an amount to be proven at a trial in this matter from the defendants, and each of them.

**Third Claim For Relief**

**(Punitive Damages)**

**(Against All Defendants)**

97.     Defendants, alternatively, acted with conscious and deliberate disregard for the known rights and interests of others, and the substantial risk of harm to others arising therefrom, thus subjecting themselves to an award of punitive damages, which plaintiffs seek in an amount to be proven at trial in this matter from the defendants, and each of them.

WHEREFORE, having pled their claims as against defendants, plaintiffs request judgment in their favor and against defendants, and each of them, as follows:

A.     For an award of the full amount of their damages, statutory and punitive, in an amount to be proven at trial, as alleged herein, jointly and severally;

B.    For attorneys' fees and costs, and pre and post judgment interest, to the fullest extent permitted by law; and,

C.    For such other relief as may be justified in the circumstances, in their favor and against defendants.

RESPECTFULLY SUBMITTED this 28th day of February, 2012.

CONANT & ASSOCIATES, PLC

By:    _____/s/ Paul A. Conant_____
Paul A. Conant
2398 East Camelback Road, Suite 925
Phoenix, Arizona  85016
Attorneys for plaintiffs